UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

EBERSPAECHER NORTH AMERICA,
INC.

                Plaintiff,                Case No. 06-15752
                                            Honorable Nancy G. Edmunds

v.

VAN-ROB, INC.

                Defendant.

_____/

**ORDER GRANTING DEFENDANT'S MOTION TO DISSOLVE PRELIMINARY
INJUNCTION [15]**

This matter is before the Court on Defendant's motion to dissolve preliminary
injunction. Oral argument was heard on September 28, 2007, before Judge Victoria
Roberts. Judge Roberts subsequently recused herself. The matter is now before this
Judge. For the reasons stated below, the Court **GRANTS** Defendant's motion.

**I.      BACKGROUND**

Defendant Van-Rob, Inc. ("Van-Rob") is a seller of automotive mufflers. Plaintiff
Eberspaecher North America, Inc. ("ENA") is a manufacturer and seller of automotive
exhaust system products. ENA and Van-Rob entered into contracts under which Van-
Rob sells three muffler assemblies to ENA's Brampton, Ontario facility. ENA then
incorporates the mufflers into complete exhaust systems and supplies them to
Chrysler's Brampton Assembly Plant. ENA notes that its Brampton facility has nearly
200 employees and generates yearly sales revenue of approximately $90 million. (Pl.'s
Exh. 1, Affidavit of Karin Guillou at ¶6.)

ENA contends that Van-Rob's mufflers are specifically engineered and custom-made to meet ENA's and Chrysler's industry-specific engineering specifications.  (*Id.* at ¶8.)  ENA also contends that Van-Rob supplies the mufflers on a "just in time" basis, which is the automotive inventory control standard.  "Just in time" means that ENA requires frequent shipments of mufflers because it only has enough on hand to support less than three days of production.  ENA contends that this standard causes it--and Chrysler by extension--to be entirely dependent on Van-Rob to honor its shipment obligations.  According to ENA, the slightest shortfall or delay in Van-Rob's supply of the mufflers negatively impacts its manufacturing operations and threatens its supply of the exhaust systems to Chrysler.  (*Id.* at ¶19.)  ENA states that it would shut down in a matter of days if Van-Rob ceased production of the mufflers, which would subject it to extensive penalties and the immediate loss of its reputation and good standing.  ENA states that Van-Rob is the only producer of mufflers meeting Chrysler's conditions and specifications and it cannot obtain an alternative muffler supplier soon enough to avoid supply interruptions.  (*Id.* at ¶18.)

The three muffler assemblies are identified by part numbers:

(1) 11.52.205.04.000 ("EB-004");

(2) 11.52.206.02.000 ("EB-1014"); and

(3) 11.52.206.07.000 ("EB-1016").

Van-Rob asserts that it offered to produce the EB-004 assembly at a per-part price of $25.53 plus the cost of certain sub-components.  (Def.'s Exh. 1, Affidavit of Blaine S. Gignac at ¶9.)  Van-Rob's offer stated the quoted price was "subject to applicable Alloy Surcharges."  (*Id.*; Def.'s Exh. A, Updated Quotation.)  Van-Rob contends that ENA

accepted the offer on November 22, 2002 by issuing a Purchase Order for one pre-production EB-004 assembly.  (Def.'s Exh. 1 at ¶10; Def.'s Exh. B.)  The Purchase Order states, "Purchases are subject to [ENA] terms and conditions.  Documentation available upon request."  (Def.'s Exh. B.)

Van-Rob contends that after the contract for the pre-production EB-004 assembly was executed, it continued negotiating production assembly prices with ENA.  Van-Rob issued a written offer to supply the production EB-004 assemblies at a price of $49.94 per assembly, including the cost of all sub-components.  The price was "subject to all Alloy Surcharges."  (Def.'s Exh. 1 at ¶11; Def.'s Exh. C, Muffler Quotation.)  Van-Rob states that ENA accepted its offer on September 15, 2003 by issuing a Scheduling Agreement for 999,999,999 production EB-004 assemblies at the price of $49.94 per assembly.  (Def.'s Exh. 1 at ¶12; Def.'s Exh. D.)  The Scheduling Agreement states, "Purchases are subject to [ENA] terms and conditions.  Documentation Available upon request."  (Def.'s Exh. D.)  There is no disagreement that no terms and conditions were attached to the Scheduling Agreement and that the first ENA terms and conditions are dated January 2004.  Van-Rob states that the terms and conditions cannot apply to the EB-004.

Van-Rob states that throughout 2004, two of its suppliers--who ENA directed Van-Rob to use--began charging higher prices for the steel sub-components used in its muffler assemblies.  This led to a significant increase in Van-Rob's material costs, and it sought to increase the prices of its muffler assemblies.  Notwithstanding the provision that Van-Rob's prices were "subject to all Alloy Surcharges," ENA refused to pay an increased price.  (Def.'s Exh. 1 at ¶¶ 15-16.)  ENA contends that it consistently

reminded Van-Rob that it was contractually obligated to supply the mufflers at fixed prices per its terms and conditions. ENA also demanded adequate assurances from Van-Rob that it would honor the contracts. (Pl.'s Exh. 1 at ¶13.)

Van-Rob continued to ship the production EB-004 assemblies at the contract price of $49.94 until November 2004, when it agreed to reduce the price to $49.50 per assembly because of lower freight costs. (Def.'s Exh. 1 at ¶17.) On January 25, 2005, ENA issued a Scheduling Agreement for EB-004 assemblies, which purported to decrease the price from $49.50 to $46.13. (Def.'s Exh. 1 at ¶18; Def.'s Exh. E.) Van-Rob rejected ENA's request and continued to ship the EB-004 assemblies with invoices reflecting the contract price. (Def.'s Exh. 1 at ¶¶ 19-21; Def.'s Exh. F, E-mail from Blaine Gignac to Bill Petrusha.) ENA disregarded the invoices and paid $46.13 per assembly. Van-Rob claims that ENA accumulated a debt of more than $460,000 in connection with the EB-004 assembly. (Def.'s Exh. 1 at ¶¶ 21-22.)

Van-Rob and ENA also negotiated the production assembly prices for the EB-1014 and the EB-1016. During these discussions, Van-Rob sent ENA written offers and ENA sent corresponding Scheduling Agreements to Van-Rob. All of Van-Rob's offers were subject to "applicable Alloy Surcharges" and changes to the United States and Canadian exchange rates. (Def.'s Exh. 1 at ¶24.) In its original proposed acceptances of these offers, ENA inserted language stating that "[n]o alloy surcharges will be paid on the LX [muffler assembly] program." Van-Rob states it did not agree to this language. (*Id.* at ¶25.)

On January 5, 2005, Van-Rob issued a written offer to enter into a contract for the EB-1014 and EB-1016 assemblies at $52.57 per assembly. The offer stated that

"[a]ll prices are subject to applicable Alloy Surcharges" and that the "[e]xchange rate [was] to be adjusted in either direction after 2% change." (*Id.* at ¶27; Def.'s Exh. G.) Van-Rob asserts that in June 2005, ENA accepted the offer by issuing Scheduling Agreements for the EB-1014 and EB-1016 assemblies. (Def.'s Exh. 1 at ¶28.) The Scheduling Agreements specified that the $52.57 price was only valid through August 15, 2005 and that the "[f]inal piece price [was] to be negotiated." (Def.'s Exhs. H and I.)

On October 19, 2005, ENA issued a different Scheduling Agreement for the EB-1014, purportedly reducing the price from $52.57 to $45.00. (Def.'s Exh. 1 at ¶30; Def.'s Exh. J.) This Scheduling Agreement states, "Purchases are subject to [ENA] terms and replace any/all issues and terms noted on the quotation(s)." (Def.'s Exh. J.) ENA attached a copy of its terms and conditions to this Scheduling Agreement. (Def.'s Exh. 1 at ¶31.)

Van-Rob states that ENA's terms and conditions were not incorporated into the contract because it did not assent to them. (*Id.* at ¶32.) Van-Rob also states that it objected to ENA's purported reduction. (*Id.* at ¶¶ 32-33; Def.'s Exh. J, E-mail from Blaine Gignac to Bill Petrusha.) However, Van-Rob continued to ship the assemblies to ENA. Van-Rob asserts that as of December 2006, ENA owes over $537,000 for failing to pay the contract price for the EB-1014 and EB-1016 assemblies. (Def.'s Exh. 1 at ¶¶ 34-35.)

On May 8, 2006, Van-Rob informed ENA of significant market changes that required a price increase for the EB-004, EB-1014, and EB-1016 muffler assemblies. Van-Rob also informed ENA that it could find another supplier for the assemblies who could meet its price demands. (*Id.* at ¶¶ 38-39; Def.'s Exh. K, Letter from Blaine S.

Gignac to Rick Arms.) Van-Rob stated the new prices were as follows: (1) $58.88 for the EB-004; (2) $64.06 for the EB-1014; and (3) $62.32 for the EB-1016. (Def.'s Exh. K.)

On August 23, 2006, Van-Rob informed ENA that it could no longer manufacture the assemblies at the current prices and that it would stop shipment beginning September 8, 2006. (Def.'s Exh. 1 at ¶41; Def.'s Exh. L, E-mail from Blaine Gignac to Karin Guillou.) Van-Rob states that it extended the "stop-shipment" deadline several times at ENA's request until November 29, 2006 became the final "stop-shipment" date. (Def.'s Exh. 1 at ¶43; Def.'s Exh. M, E-mail from Bruce Johnson to Karin Guillou.)

On November 20, 2006, ENA filed suit in the Oakland County Circuit Court against Van-Rob alleging anticipatory repudiation and/or breach of contract. ENA sought declaratory and injunctive relief, as well as money damages. The Oakland County Circuit Court issued a temporary restraining order against Van-Rob on November 29, 2006. On December 13, 2006, that court heard oral argument and granted ENA's motion for a preliminary injunction.

Van-Rob removed the case to this Court on December 27, 2006. On August 15, 2007, the Court issued an Order stating that it will retain jurisdiction because Eberspaecher Exhaust Systems Canada, Inc. was fraudulently joined. Van-Rob then filed this "Motion to Dissolve Preliminary Injunction" on August 31, 2007.

Van-Rob states that the Court should dissolve the preliminary injunction because the Oakland County Circuit Court granted it without: (1) reading its written submissions, including the sworn affidavit of Blaine Gignac and the contract documents; (2) taking any evidence; or (3) permitting it full argument.

6

ENA states that Van-Rob did not present any compelling new evidence that justifies reversal of the Oakland County Circuit Court's well-reasoned decision. According to ENA, Van-Rob presents the same facts and arguments that it did in the Oakland County Circuit Court. ENA argues that because the court issued the preliminary injunction after extensive briefing by both parties and Van-Rob does not claim a change in circumstances or conditions, the preliminary injunction should remain intact.

## II. ARGUMENTS

### A. Likelihood of Success on the Merits

Van-Rob argues that ENA cannot demonstrate a likelihood of success on the merits because it cannot prove a breach of contract. Van-Rob states that the first step to proving a breach of contract is to determine whether a contract was formed. "[I]t is necessary to determine which of the [parties'] forms constituted the 'offer' and which form constituted the 'acceptance.'" *Challenge Mach. Co. v. Mattison Mach. Works*, 359 N.W.2d 232, 235 (Mich. Ct. App. 1984). "Courts must often look beyond the words employed in favor of a test which examines the totality of the circumstances." *Id.* (citing *Mead Corp. v. McNally-Pittsburg Mfg. Corp.*, 654 F.2d 1197 (6th Cir. 1981)).

Van-Rob asserts that its price quotes--with the express conditions that "all prices are subject to applicable Alloy Surcharges" and that prices could be adjusted to reflect changes in the exchange rate--are considered offers under the Uniform Commercial Code ("UCC"). It further asserts that each Scheduling Agreement constituted an acceptance of the offer and of Van-Rob's conditions even though they attempted to add

additional terms.  *See* UCC §2-207(1) ("[a] definite and seasonable expression of acceptance or a written confirmation . . . operates as an acceptance even though it states terms additional to or different from those offered or agreed upon"); *see also Robert Bosch Corp. v. ASC Inc.*, 195 F. App'x 503, 506 (6th Cir. 2006) ("[w]e agree with the district court that [Seller's] . . . quotation was an offer because it stated the essential terms and that [Buyer's] . . . [purchase order] was an acceptance of [Seller's] . . . quotation and offer.").

Van-Rob states that ENA's additional terms and conditions are not incorporated into the contracts because they materially alter the contract terms.  *See* Mich. Comp. Laws §440.2207(2)(b) ("The additional terms are to be construed as proposals for addition to the contract.  Between merchants such terms become part of the contract unless[] they materially alter it"); Mich. Comp. Laws §440.2207, cmt. 3 ("If [the additional or different terms] are such as materially to alter the original bargain, they will not be included unless expressly agreed to by the other party.").  In addition, it did not expressly assent to the terms and conditions.  *See Arizona Retail Sys., Inc. v. Software Link, Inc.*, 831 F. Supp. 759, 764 (D. Ariz. 1993) ("[UCC] [s]ection 2-209 requires assent to proposed modifications and . . . the assent must be express and cannot be inferred merely from a party's conduct in continuing with the agreement.").  Further, the terms and conditions are titled "Purchase Order Terms and Conditions."  (Def.'s Exh. J.)  Van-Rob states that ENA only issued "Purchase Orders" for tooling purchases.  Scheduling Agreements were issued for production parts.

Van-Rob notes that its continued shipment of mufflers cannot constitute a waiver

of its objection to the terms and agreements because ENA cannot show Van-Rob's conduct was an "intentional relinquishment of a known right."  *See Sweebe v. Sweebe*, 712 N.W.2d 708, 712 (Mich. 2006).  Therefore, Van-Rob argues, contracts were formed and the prices of the muffler assemblies could be adjusted based on changes in alloy surcharges and the exchange rate.

Van-Rob states that in order for ENA's Scheduling Agreements to be considered counteroffers, they must be "[e]xpressly made conditional on assent to the additional or different terms."  UCC §2-207(1).  It must be clear that "[t]he offeree is unwilling to proceed with the transaction unless [it] is assured of the offeror's assent to the additional or different terms therein."  *Dorton v. Collins & Aikman Corp.*, 453 F.2d 1161, 1168 (6th Cir. 1972); *see also Challenge Mach.*, 359 N.W.2d at 235-36 ("[T]he inclusion of additional or different terms [does] not prevent the acceptance from being operative unless the acceptance was made conditional on the assent of the other party to those additional or different terms.").  ENA's terms and conditions provide that, "[a]cceptance is expressly limited to the terms of Buyer's offer" and that "Buyer expressly rejects any modifications proposed by Seller."  (Def.'s Reply, Exh. 2.)  Van-Rob argues that this is insufficient to show ENA was unwilling to proceed with the transaction unless Van-Rob agreed to the terms and conditions.

ENA states that in demonstrating a likelihood of success, "[i]t is ordinarily sufficient if the plaintiff has raised questions going to the merits so serious, substantial, difficult, and doubtful as to make them a fair ground for litigation and thus for more deliberate investigation."  *Six Clinics Holding Corp., II v. Cafcomp Sys., Inc.*, 119 F.3d 393, 402 (6th Cir. 1997) (citing *In re DeLorean Motor Co.*, 755 F.2d 1223, 1229 (6th Cir.

1985)).  ENA contends that there is "little question" that it will succeed on the merits.

### a.  Terms and Conditions

ENA states that its terms and conditions define "Offer" and "Acceptance" as follows:

1.  Offer; Acceptance

(a) This order constitutes [ENA's] offer to enter into a contract with [Van-Rob] on the terms and conditions of this order.  [Van-Rob's] written acceptance or [Van-Rob's] delivery of the goods, rendering of any services, or commencement of any work pursuant to this order, whichever occurs first, will constitute acceptance of [ENA's] offer.

(b) Acceptance is expressly limited to the terms of [ENA's] offers.  Once accepted, the terms and conditions of this order will be the complete and exclusive statement of the contract and will supercede any prior or contemporaneous negotiations or agreements. [ENA] expressly rejects any modifications proposed by [Van-Rob].  Such modifications shall not become part of this contract without [ENA's] written acceptance.

(Pl.'s Exh. 3.)  ENA asserts that Van-Rob's price quotations constitute offers and its Scheduling Agreements are counteroffers.  ENA states that its terms and conditions explicitly state that shipment constitutes acceptance of all terms contained in the contracts.  Therefore, Van-Rob accepted its counteroffers and its terms and conditions--which are incorporated by law--when it shipped the mufflers.  *See Mantaline Corp. v. PPG Indust. Inc.*, No. 97-4473, 2000 WL 799337 (6th Cir. June 8, 2000) (holding that where a purchase order invited acceptance by the prompt shipment of conforming goods, the seller accepted all of the terms contained in the purchase order when it shipped the goods); UCC §2-206(1)(b) and Mich. Comp. Laws §440.2206(1)(b):

Unless otherwise unambiguously indicated by the language or circumstances an order or other offer to buy goods for prompt or current shipment shall be construed as inviting acceptance either by a prompt

promise to ship or by the prompt or current shipment of conforming or nonconforming goods, but such a shipment of nonconforming goods does not constitute an acceptance if the seller seasonably notifies the buyer that the shipment is offered only as an accommodation to the buyer.

ENA argues that because the terms and conditions state, "The price(s) for the goods are set forth in the order. No adjustments will be made for increase in Seller's costs, including, without limitation, increases in the costs for labor, material, shipping, packaging, transportation or overhead," Van-Rob sold the muffler assemblies to it at fixed prices. (Pl.'s Exh. 3 at 11.) ENA argues that Van-Rob cannot threaten to stop shipment of the mufflers or unilaterally increase the agreed-upon prices. *See Quality Products & Concepts Co. v. Nagel Precision, Inc.*, 666 N.W.2d 251, 253 (Mich. 2003):

We hold that parties to a contract are free to *mutually* waive or modify their contract notwithstanding a written modification or anti-waiver clause because of the freedom to contract. However, with or without restrictive amendment clauses, the principle of freedom to contract does not permit a party *unilaterally* to alter the original contract. Accordingly, mutuality is the centerpiece to waiving or modifying a contract, just as mutuality is the centerpiece to forming any contract.

(Emphasis in original).

ENA contends that Van-Rob's arguments that it did not see the terms and conditions and that it should not be bound by a "form" contract lack merit. *See Forge v. Smith*, 580 N.W.2d 876, 881-82 (Mich. 1998) (holding that although they were in a separate document, the building plans were incorporated into the building contract by reference); *Scholz v. Montgomery Ward & Co.*, 468 N.W.2d 845, 848 (Mich. 1991) (holding that a party may not avoid a contract on the ground that it was ignorant of the contract provisions). ENA asserts that Van-Rob has the commercial sophistication to know the terms and conditions were incorporated into the Scheduling Agreements.

ENA distinguishes *Robert Bosch Corp. v. ASC Inc.*, 195 F. App'x 503 (6th Cir. 2006). In *Robert Bosch*, the plaintiff argued that its purchase order was either an offer or a conditional acceptance. *Id.* at 506 The Court found that the plaintiff's purchase order was an unequivocal acceptance of the defendant's offer because "[a]lthough the [purchase order] stated that acceptance was limited to its terms, it did not clearly indicate that [defendant's] failure to [assent to the different or additional terms] voided the transaction." *Id.* In contrast, ENA asserts that its terms and conditions show an unwillingness to proceed unless Van-Rob accepted the terms. *See Allied Steel & Conveyors, Inc. v. Ford Motor Co.*, 277 F.2d 907, 909-11 (6th Cir. 1960) (holding that a purchase order stating it was not binding until accepted by seller was an offer, and seller's performance constituted acceptance).

ENA also distinguishes *Challenge Mach. Co. v. Mattison Mach. Works*, 359 N.W.2d 232 (Mich. Ct. App. 1984). ENA asserts that the buyer's purchase order in *Challenge Mach.* constituted an acceptance of the seller's offer because it was responsive to the seller's proposal. *Challenge Mach.*, 359 N.W.2d at 235. However, ENA argues, its terms and conditions are clear that shipment of the mufflers by Van-Rob constitutes acceptance.

**b. Specific Performance**

ENA states that a court may issue a "[d]ecree for specific performance [which] include[s] such terms and conditions as to payment of the price, damages, or other relief as [it] may deem just." *See* UCC §2-716(2). ENA argues that a preliminary injunction is proper in this case because it only gives it its rights under the contracts. *See Zak v. Gray*, 37 N.W.2d 550, 551 (Mich. 1949) ("[s]pecific performance will be

decreed where its effect will be to give to each party that for which he contracted and will work no wrong or injustice to either") (citing *Chicago, Kalamazoo & Saginaw Railway Co. v. Lane*, 113 N.W. 22 (Mich. 1907)).

ENA also states that specific performance is appropriate in the automotive industry. *See TRW, Inc. v. Indus. Sys. Associates, Inc.*, 47 F. App'x 400, 401 (6th Cir. 2002) (agreeing with the Magistrate Judge that a preliminary injunction was proper where "[a]utomakers could not readily obtain air bags from a second source if [plaintiff] were to fail to supply them."). And, "[w]here the goods are unique or in other proper circumstances." UCC §2-716(1). According to UCC §2-716, cmt. 2:

> The test of uniqueness . . . must be made in terms of the total situation which characterizes the contract. Output and requirements contracts involving a particular or peculiarly available source or market present today the typical commercial specific performance situation. [H]owever, uniqueness is not the sole basis of the remedy under this section for relief may also be granted "in other proper circumstances" and inability to cover is strong evidence of "other proper circumstances."

ENA argues that a preliminary injunction is the proper remedy to maintain its "requirement contracts" with Van-Rob. *See e.g.*, *Eastern Air Lines, Inc. v. Gulf Oil Corp.*, 415 F. Supp. 429, 442-43 (S.D. Fla. 1975) (holding that a preliminary injunction was necessary to require the oil company to continue performing under its requirements contract); *Copylease Corp. of Am. v. Memorex Corp.*, 408 F. Supp. 758, 759-60 (S.D.N.Y. 1976) ("[t]he drafters [of the UCC] seem to have contemplated that at least in some circumstances specific performance will issue [for requirements contracts] contrary to the historical reluctance to grant such relief in these situations.").

### B. Irreparable Harm

Van-Rob contends that ENA is the only entity that can cause it harm. Van-Rob

argues that ENA has an affirmative duty to mitigate its damages by "covering."  *See* Mich. Comp. Laws §440.2715(2)(a) ("Consequential damages resulting from the seller's breach include any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise"); *McCullagh v. Goodyear Tire & Rubber Co.*, 69 N.W.2d 731, 737 (Mich. 1955) ("[i]t is a well-established rule that in a case of a breach of contract the injured party must make every reasonable effort to minimize the damages suffered") (quoting *Rich v. Daily Creamery Co.*, 296 N.W. 253, 258 (Mich. 1941)).  And, it cannot claim to suffer an irreparable harm by disregarding its own duties.  *See Commodex Sys. Corp. v. GTE Telenet Communications Corp.*, 543 F. Supp. 164, 165 (S.D.N.Y. 1982) (holding that plaintiff "cannot through its own conduct transform an injury compensable in money damages into an irreparable injury"); *Salt Lake Tribune Pub. Co. v. AT&T Corp.*, 320 F.3d 1081, 1106 (10th Cir. 2003) ("We will not consider a self-inflicted harm to be irreparable.").

Van-Rob states that ENA can "cover" by paying the increased price and pursuing "adequate compensatory or other correct relief . . . at a later date, in the ordinary course of litigation."  *Sampson v. Murray*, 415 U.S. 61, 90 (1974) (quoting *Virginia Petroleum Jobbers Ass'n v. Federal Power Commission*, 259 F.2d 921, 925 (D.C. Cir. 1958)); *see also e.g.*, *Cellnet Communications, Inc. v. New Par*, 291 F. Supp.2d 565, 570 (E.D. Mich. 2003) ("[t]he classic remedy for breach of contract is an action at law for damages.  If the injury complained of may be compensated by an award of monetary damages, then an adequate remedy at law exists and no irreparable harm may be found as a matter of law") (quoting *Jerome-Duncan, Inc. v. Auto-By-Tel,*

*L.L.C.*, 966 F. Supp. 540, 541 (E.D. Mich. 1997)); *Paw Paw Wine Distributors, Inc. v. Joseph E. Seagram & Sons, Inc.*, 603 F. Supp. 398, 401 (W.D. Mich. 1985) (finding that although obtaining wine from another distributor was more expensive, plaintiff did not suffer irreparable harm and money damages were adequate). Van-Rob asserts that ENA's "adequate compensatory or other complete relief" is suing Van-Rob for the difference between the alleged contract price and Van-Rob's price.

Van-Rob asserts that this course of action will allow ENA to preserve its business relationship with Chrysler, prevent its production from being interrupted, save its reputation, and maintain its right to pursue damages from Van-Rob. Therefore, Van-Rob contends that ENA's potential damages are not "irreparable" because they are compensable by a money judgment – the difference between the contract price and the "cover" price. *See Kelsey-Hayes Co. v. Galtaco Redlaw Castings Corp.*, 749 F. Supp. 794, 799 n.10 (E.D. Mich. 1990) ("The buyer may recover from the seller as damages the difference between the cost of cover and the contract price together with any incidental or consequential damages") (citing Mich. Comp. Laws §440.2712(2)). Van-Rob states that ENA did not produce any evidence or affidavits showing that it is unable to pay the price increases that Van-Rob seeks for the three muffler assemblies.

ENA argues that a preliminary injunction is proper because damages are an inadequate remedy. ENA states that "[I]f the specific property is not obtainable on the market and damages will not provide adequate compensation, equity may take jurisdiction." *Jaup v. Olmstead*, 55 N.W.2d 119, 120 (Mich. 1952) (citing *Cole v. Cole Realty Co.*, 135 N.W. 329 (Mich. 1912); *Gallagher v. Studebaker Corp.*, 210 N.W. 233 (Mich. 1926)). According to ENA, Van-Rob is its sole source of supply for unique

automotive components and parts. Therefore, the following "irreparable harm" will occur if Van-Rob is allowed to cease supplying the mufflers: (1) it will be unable to fulfill its commitments to its customers; (2) its demand for component parts from its suppliers will drop to zero; (3) its production lines will shut down within just a few days; (4) nearly 200 of its employees will be idled; (5) all of its suppliers will be negatively impacted and likely will be forced to idle hundreds, if not thousands, of their employees; (6) it will be unable to meet its contractual commitments to Chrysler, idling hundreds of Chrysler workers; (7) its relationship with Chrysler will be jeopardized; (8) Chrysler's Brampton Assembly Plant in Ontario could shut down, costing it as much as $1.7 million per day ($1,200.00 per minute) in penalties from Chrysler; and (9) the damage to its reputation and goodwill will be devastating, inestimable, and irreparable. (*See* Pl. Exh. 1 at ¶21.)

ENA cites *Zurn Constructors, Inc. v. B.F. Goodrich Co.*, 685 F. Supp. 1172 (D. Kan. 1988) to support its argument that these consequences constitute irreparable harm. In *Zurn*, the plaintiff claimed that if the defendant discontinued its monthly supply of polyvinylchloride ("PVC") powder compound the follow would occur: (1) it would be unable to meet customer demands; (2) it would lose goodwill and eventually its customers; (3) it would have to lay off 10-12 employees; (4) its operations would be cut from seven days per week to five days per week; and (5) it would eventually have to cease its manufacturing operations. *Zurn*, 685 F. Supp. at 1181. The court stated that "[n]umerous cases support the conclusion that loss of customers, loss of goodwill, and threats to a business' viability can constitute irreparable harm." *Id.* The court concluded that the potential loss of an entire division of a company and a major employer in a small town was not compensable by money damages. Therefore, the court issued a

16

preliminary injunction to protect the plaintiff from irreparable harm. *Id.* at 1181-82.

ENA also cites *Kelsey-Hayes Co. v. Galtaco Redlaw Castings Corp.*, 749 F. Supp. 794 (E.D. Mich. 1990) for the position that the "normal" legal remedy of accepting a supplier's breach of contract and then suing for damages is inadequate in the automotive industry. In *Kelsey-Hayes*, the defendant threatened to stop production and delivery of castings unless plaintiff agreed to significant price hikes. *Kelsey-Hayes*, 749 F. Supp. at 797. Plaintiff believed that a brief interruption in casting shipments would force one of its major customers, Ford, to halt production of a vehicle line. Plaintiff alleged this would injure its business reputation and subject it to large monetary damages. *Id.* at 798. The Court held that because the plaintiff was faced with the imminent shutdown of its major customer's plant, its only alternative was to agree to the defendant's "requests" for price increases. *Id.* "It is hardly necessary to add that [plaintiff's] normal legal remedy of acceptance of [defendant's] breach of the contract and then suing for damages would have been inadequate under the circumstances." *Id.* The Court also noted that in the automotive industry, the defendant's actions are more likely to constitute duress:

> It is well known that in an effort to promote efficiency, car manufacturers are reducing the size of their reserve banks of parts. As a result, component parts are often incorporated into a finished product within a few hours of their delivery. A supplier's failure to make scheduled shipments may have immediate and dramatic consequences. [T]hus, a breach of contract in the automotive industry may be more coercive than in other industries.

*Id.* at 798 n.7; *see also General Motors Corp. v. Paramount Metal Products Co.*, 90 F. Supp.2d 861, 875 (E.D. Mich. 2000) (citing testimony that "GMC would have lost millions of dollars per day if Paramount immediately ceased production and shipment of

the plaintiffs' seat frame requirements.").

In addition, ENA presented argument that it would be forced into insolvency if it "covered." However, the witness ENA presented could not state the test for insolvency and had no familiarity with ENA's assets, liabilities, or balance sheets.

The Court finds the "irreparable harm" factor weighs in Van-Rob's favor.

### C.  Balance of Harms

Van-Rob argues that the balance of harms tips in its favor. Van-Rob states that it has supplied mufflers to ENA under an improvidently granted preliminary injunction for many months while ENA has used the injunction as a license to continue refusing to adjust its prices or to negotiate. Van-Rob contends that ENA's counsel stated in a meeting that ENA was completely unwilling to pay any price increases unless Chrysler "lavishes" ENA with extra money for the assemblies. Van-Rob believes that Chrysler agreed to pay ENA's price increases, but ENA refuses to offer any accommodation to Van-Rob. Van-Rob asserts this is because it lacks an incentive to do so while the injunction remains in place. In addition, Van-Rob states that the injunction forces it to unfairly accept ENA's unilaterally lowered prices instead of prices that reflect market realities. Therefore, Van-Rob argues that this Court should dissolve the injunction so that it can stop bearing the costs of inflation, contrary to its contracts with ENA.

ENA contends that the balance of harms tips decidedly in its favor. According to ENA, it cannot pay more than the fixed prices because Chrysler is unwilling to pay Van-Rob's increased costs. Therefore, ENA asserts that the preliminary injunction should continue. ENA argues that if it is dissolved, its business will shutdown. However, if the

preliminary injunction is continued, Van-Rob can simply continue supplying the mufflers at the agreed upon price because it has done that since May 2006.  *See Zurn*, 685 F. Supp. at 1182 (granting preliminary injunction to buyer of PVC powder compound where the "plaintiff's potential loss of its entire business decidedly outweighs the defendant's potential lost profits and its being forced to alter its corporate strategy.").  ENA also argues that Van-Rob can be made whole through monetary damages if it later shows that a preliminary injunction was improper.  *See Kaiser Trading Co. v. Associated Metals & Minerals Corp.*, 321 F. Supp. 923, 934 (N.D. Cal. 1970) ("[e]ven if [the defendant] were to prevail ultimately on the merits by justifying its repudiation of the contract . . . it could be recompensed adequately in money damages.").

The Court finds this factor weighs in favor of neither party.

### D.  Public Interest

ENA states that the preliminary injunction serves the public's interest in preserving the enforceability of contracts by compelling the parties to honor their contractual commitments.  *See Neveux v. Webcraft Technologies, Inc.*, 921 F. Supp. 1568, 1571-72 (E.D. Mich. 1996) (declining to hold that a Non-Competition Agreement was unreasonable and unenforceable).  ENA also argues that the public is interested in maintaining the uninterrupted supply of automobiles and protecting the employees of ENA and Chrysler.

Van-Rob agrees that there is a public interest in enforcing contracts, but disputes that an injunction is necessary to preserve the jobs of ENA's workers or the efficient operation of Chrysler's automobile assembly operations.  According to Van-Rob, the only dispute concerns who is entitled to money damages.

19

The Court finds this factor weighs in favor of neither party.

III.    **APPLICABLE LAW AND ANALYSIS**

"A district court can dissolve or modify state court injunctions issued prior to removal." *Clio Convalescent Ctr. v. Michigan Dep't of Consumer and Indus. Services*, 66 F. Supp.2d 875, 877 (E.D. Mich. 1999) (citing *Resolution Trust Corp. v. Bayside Developers*, 43 F.3d 1230 (9th Cir. 1994) and 28 U.S.C. §1450)).  In determining whether to grant injunctive relief, the Court considers the following:

(1) the plaintiff's likelihood of success on the merits of the action;
(2) the irreparable harm to the plaintiff that could result if the court does not issue the injunction;
(3) whether the interests of the public will be served; and
(4) the possibility that the injunction would cause substantial harm to others.

*Id*.  "In making its determination, the 'district court is required to make specific findings concerning each of the four factors, unless fewer factors are dispositive of the issue.'" *Lorillard Tobacco Co. v. Amouri's Grand Foods, Inc.*, 453 F.3d 377, 380 (6th Cir. 2006) (quoting *Six Clinics Holding*, 119 F.3d at 399)).

This Court decides this motion in Van-Rob's favor because ENA has not shown that it will suffer "irreparable harm" absent the preliminary injunction.  A party's harm is "irreparable" when it cannot be adequately compensated by money damages.  *See Merrill Lynch, Pierce, Fenner & Smith, Inc. v. E.F. Hutton & Co.*, 403 F. Supp. 336, 343 (E.D. Mich. 1975).  ENA alleges that if the preliminary injunction is dissolved and Van-Rob ceased shipment of the mufflers: (1) its production lines will shut down within just a few days; (2) thousands of employees will be idled; (3) it will be unable to meet its contractual commitments to its customers and Chrysler; (4) its relationship with Chrysler

will be jeopardized; (5) its demand for parts from suppliers will drop to zero; (6) it will have to pay millions of dollars in penalties from Chrysler; (7) the Chrysler Brampton assembly plant could shut down; and (8) its reputation and goodwill will be damaged beyond repair. However, each of these proposed problems can be solved with money damages. Although ENA alleged that it cannot afford to pay Van-Rob's increased prices, it failed to provide concrete evidence. Hence, ENA can pay Van-Rob its requested prices and pursue a breach of contract action against Van-Rob for money damages.

The Court finds that equitable relief is not the proper remedy. *See Lucero v. Detroit Public Schools*, 160 F. Supp.2d 767, 801 (E.D. Mich. 2001) ("[a] showing of 'probable irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction'") (quoting *Reuters Ltd. v. United Press Int'l., Inc.*, 903 F.2d 904, 907 (2nd Cir. 1990)); *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) ("[t]he absence of a substantial likelihood of irreparable injury . . . standing alone[] make[s] preliminary injunctive relief improper.").

## IV. CONCLUSION

The Court **GRANTS** Defendant's motion. The preliminary injunction issued by the Oakland County Circuit Court prior to removal is HEREBY DISSOLVED.

SO ORDERED.

s/Nancy G. Edmunds
Nancy G. Edmunds
United States District Judge

Dated:  February 28, 2008

I hereby certify that a copy of the foregoing document was served upon the parties
and/or counsel of record on February 28, 2008, by electronic and/or ordinary mail.

s/Carol A. Hemeyer
Case Manager